In this case, on the document 42-14-0388, you will receive a preliminary plaintiff appellee, the Christine A. Lentz, defendant or defendant. Arguing on behalf of the defendant or defendant, Attorney Mr. Nicholas Curran. Arguing on behalf of the plaintiff appellee, Attorney Ms. Christine Griffin Shuman. Good morning, folks. Mr. Curran, you can proceed. May it please the court, counsel. My name is Nicholas Curran. I'm an attorney with Kathleen Zellner & Associates, and I represent the defendant appellant, Ms. Christine Lentz. Ms. Lentz was convicted following a jury trial of the murder of her father, and she was sentenced to 50 years in the Department of Corrections. On direct appeal, this court affirmed her conviction. The defendant then filed a petition for post-conviction relief, which the circuit court dismissed at the second stage without an evidentiary hearing. This is an appeal from that decision. Of course, as this court is aware, the question to be answered at the second stage under the Post-Conviction Hearing Act is whether or not the defendant has made a substantial showing of a constitutional violation. In her petition, the defendant has alleged that she was denied her right to effective assistance of counsel. Thus, as it applies to the defendant's case, the question becomes whether or not she's made a substantial showing that her attorney rendered deficient performance and that she was prejudiced by that deficient performance. But you cite Minnis and Evans cases. Correct. In support of your position. But aren't those cases where the defendant was excluded by the court from putting in an expert concerning battered woman syndrome? Correct. And you weren't precluded from putting that in here. That is correct. That's correct. And that's why we're arguing that it was ineffective on the part of the defendant's trial attorney to not investigate the possibility of calling such an expert. And, in fact, we attach a report from an expert, a mental health expert, to the post-conviction petition outlining all of the various opinions to which she would have been able to testify that would have bolstered the claim of self-defense at trial. We do not cite those two cases for the proposition necessarily. I should say that we don't cite those cases as necessarily bearing on the deficient aspect of counsel's performance. Based on my research, I haven't found a case where this precise issue has been raised. What we cite those cases for is the proposition that this kind of testimony, this kind of evidence, has been admitted in cases in the past in Illinois as a recognized form of evidence that is used to bolster a claim of self-defense in a situation where it's warranted. Was second-degree murder raised? Yes, self-defense and second-degree murder based on an unreasonable belief in the need to act in self-defense. That's correct. Would this have been trial strategy not to put this in? Excuse me? Take your time. There's some water next to you. I'll be okay in just one minute. I hope it wasn't my question. No, it wasn't. Something was out of my throat. We would argue that we can't make an assumption of trial strategy here because part of the claims in the petition are that defense counsel, although he discussed the possibility of consulting with such an expert with his client, he never actually took the step of contacting an expert to ascertain what it is that expert could testify to. And as we know, based on case law, you can't simply make an assumption that an attorney acted based on some trial strategy. If they have an inadequate basis upon which they're making a tactical decision, for example, if they don't interview a witness to learn of what it is that witness would testify to, then we don't indulge that presumption of sound trial strategy. Now, it may end up at a third-stage hearing that trial counsel offers a sound strategic decision for not having called an expert in battered woman syndrome, but that's not a determination that can be made at the second stage. That's a third-stage issue, in my view. Those battered woman cases usually tend to involve some type of intimate relationship, dating relationship, husband-wife relationship. I've never seen it, and maybe it's out there, but I've never seen it apply to a father-daughter relationship. Are you aware of any case? I think Your Honor is correct in that. I think what Dr. Kunstle lays out in her report is that the defendant in this case started to fill the role of the victim's wife after his wife passed some six years before the shooting took place. So it is a little bit novel in that sense, and of course there's no suggestion that there was anything sexual between the defendant and the victim. The idea, though, is that he started to treat her in just about every other respect as he treated his wife before her passing. He also treated her as his secretary in a similar fashion, secretary or bookkeeper at work, too, right? That's correct. And I don't mean this to be facetious, but I don't believe that there's a battered secretary syndrome or a battered accountant syndrome. I mean, what makes this different? Well, I think all of this stems from the dynamics of an interpersonal relationship within a household. And I'm not completely up to date on all the scientific literature as far as this is concerned. I know that there has been a trend in developing more research in the area of battered child syndrome. I don't know if that is a recognized syndrome or not at this juncture, but Dr. Kunstle's report, if you look at it closely, she believes that the defendant in this case meets the criteria of being a battered woman. And I would note that as of this juncture, the state did not argue, and I suppose that is something that could also be litigated at a third stage, whether or not there is a sufficient, reliable foundation for Dr. Kunstle's opinions. But again, that's something that would have to be fleshed out at the third stage. Of course, at the second stage of the proceedings, all of the allegations in the petition and in the attached materials are to be taken as true, except for those that are refuted by the record. And of course, at this juncture, we don't have any contrary expert testimony to rebut Dr. Kunstle's opinions. How was your claim prejudiced when the physical evidence shows that the victim was shot twice in the back of the head? That's a good question, Your Honor, and I think your question shows why it's prejudicial if you understand the nature of battered woman syndrome. I mean, battered woman syndrome is used to explain why a woman would kill her abuser in a non-confrontational situation. And of course, the reason testimony like that is so important is because a layperson, a juror, may not necessarily understand the dynamics of an abusive relationship like that, why an abused might feel helpless in that situation, like they can't escape, they can't change the situation. I imagine there were jurors who felt the exact same way. Well, you have two bullets in the back of the head, that seems like, and there was no evidence that the victim was armed. The defendant did not report this to the police. She did not report it to her family. She made very disorganized, ineffectual attempts at concealing the homicide. So I think as that emphasizes, that shows why testimony like this is so important because those are exactly the kinds of things that a battered woman would do. They would, and again, I'm basing all this off of Dr. Kunstel's report, but what she says in her report is, after years of having been in an abusive relationship, you developed learned helplessness, and that can lead to disassociation. So in a situation like this where she shoots her father instead of calling to report it right away, she learns to just ignore it, to try to stuff it deep into the recesses of her mind, hoping the problem would just go away because that's how victims of abuse cope with being victims of abuse. They try to ignore the abuse and just carry on with life as normal. And I think it's the very evidence that the state points out as establishing the overwhelming nature of the case against the defendant that made it so critical for this kind of evidence to be introduced at trial. I mean, look, the trial counsel was well aware of the challenges he faced in this case. Not only do you have an unarmed victim and you have two shots to the back of the head, you have all those things I mentioned before about the defendant not reporting, the shooting, not telling her family, making efforts to conceal the body. I believe there was even evidence that at one point she had attempted to burn the body. From the outside looking in, she was able to function normally. Well, how on earth do you explain that to a jury without testimony from a mental health expert? And again, this is evidence that's available from an expert such as this that can explain her actions. And I think the bottom line is what Dr. Kunzel or an expert like Dr. Kunzel would be able to testify to is that many of the things that would show consciousness of guilt in a person who had not been abused is a product of abuse in a person such as the defendant. So that's the stuff that happened after the murder. During the events that led to the shooting, is this battered woman syndrome and self-defense mutually exclusive, you think? Because you're talking about this helplessness and a battered woman is going to react differently than someone else. Correct. And a jury may view that differently, but of course the defense in this case was self-defense. Correct. So would the attorney have seen these as mutually exclusive? I don't believe so, Your Honor. Of course, part of what you have to prove with self-defense is that you have a reasonable apprehension of imminent bodily injury. And so battered woman syndrome can speak to two things in this case, two general topics. One is why she would have had a reasonable apprehension of imminent bodily harm in a non-confrontational situation and her actions after the shooting. And there's case law, I think it's the Minnis case which we cite in our brief, which if my memory is correct, in that case the defendant had attempted to dismember the body. And of course, you know, the immediate thought is, well, that's shocking. If you actually killed someone you at least stated that you had feelings for, you had an intimate relationship with, how on earth then could you try to dismember them? And the whole idea, again, is this disassociation, this process that a victim of abuse goes through and how they could treat the body in a manner that's unthinkable to somebody who had not suffered through that abuse. But going back to your Honor's point, there are many cases that speak to, again, this idea that, well, why didn't you just terminate your relationship with your father? Why didn't you just leave the situation? He wasn't abusing you at the time that the shooting took place, so how is it you reasonably apprehended imminent bodily harm in that situation? And that's where battered woman syndrome comes into play. I think one of the things that Dr. Kunzel outlines in her report is that when you grow up in this sort of dynamic or when you're involved in this sort of relationship, you develop a state of hyperarousal where you're always anticipating abuse. And that plays into this apprehension of imminent bodily harm, even in a situation where you don't have someone in front of you threatening you or abusing you. So I think the bottom line here is, to put it as simply as I can, to make a determination as to whether or not trial counsel was ineffective for investigating and calling a witness like this, there has to be a third stage hearing. Again, at this point, we're not arguing that the showing has been made sufficient to actually grant the petition, although that's what we'll be arguing at the next stage. But the issue here is whether or not a hearing needs to be held. And I believe absolutely, based on the petition and the allegations contained therein, that a third stage hearing is warranted. I would like to briefly discuss the second ineffective assistance claim in the petition. The failure to call the witnesses? Correct. Before you do that, would you talk to me about failing to call an expert in the crime scene reconstruction? How would that have changed anything? Well, and I will concede that I do think that that is the weakest of the three claims, ineffective assistance claims. However, the idea here is that the prosecution, their theory was that Mr. Lenz was sitting at his desk and that the defendant came up behind him, put a gun to his head, and shot him twice in the back of the head, execution style. That was an argument they made repeatedly in their closing argument. After consulting with a ballistics expert, what that expert has relayed to us, and what his affidavit, his report indicates that's attached to the petition, is that you can't, that that claim is completely speculative without doing a reconstruction of the crime scene. But wouldn't that weigh in your favor as to what you just told us about a battered woman syndrome? I mean, that would not be inconsistent with a battered woman syndrome. I agree. I agree. But again, it goes to this notion that she sort of laid in the weeds for him and waited for him to sit at his desk and then shot him twice in the back of the head. I think that that was a very prejudicial argument made against the defendant's claim of self-defense. And for that reason, I think it was vital to refute that theory to the extent counsel would have been able to. But moving to the second claim. And on that second claim, the younger Manouskis, if I'm pronouncing that correctly, what would he add to the case other than, I mean, the state's argument is that much of this evidence would be cumulative, and he talks about the prior abusive nature of the victim and alcohol abuse and things of that nature. I mean, the one thing you point out is that he was present when the victim threatened the life of the defendant. Correct. The defendant was not there. Correct. How would that be relevant? I know my time is up. No, you can proceed. So I think it would be relevant under the second prong of Lynch where it's not that the defendant was present and that it would necessarily go to her mental state, but where you have conflicting accounts of how the shooting took place, it goes to establish the victim's violent disposition in general and his violent disposition towards the defendant specifically. Obviously, prior threats made against the defendant's life makes her claim that her father confronted her with a weapon more likely to be true, which is why I think that evidence would be probative. Yeah, I just have one question. From my reading of your briefs, all of these Crawford statements of Chuck Menascus, of Taylor, of Charles Menascus, none of them had dates and times. I didn't. And even Jennifer Kellerman. I don't believe any of those, at least from my reading of it, had any dates and times in there, did they? Your Honor may be correct about that, if my memory serves. I think you probably are. And, of course, that would go to the foundation of their testimony. I would concede that. But I think that that's something that could be shored up. Well, doesn't it go to the relevance of it also? I mean, we're already talking about the evidence thus far that was presented at trial was really concerning events that occurred, some of them 25 years ago, 30 years ago, some of them a little bit less. And we don't even know what these would be. I mean, there's nothing in here about when this might have occurred. And I understand Your Honor's concerns as far as that goes. That is a product of, and because our office represented the petitioner, you sort of run into this issue of, well, how detailed do you make an affidavit? You want to make it detailed enough so that you can establish that the testimony would be relevant and probative and important. But at the same time, it's impractical to include every single detail regarding what it is the witness knows in the affidavit. Now, setting aside Chuck and the two older witnesses, Taylor Manouskas, the defendant's daughter, was approximately 7 years old at the time the shooting occurred. So obviously the things that she saw, and her testimony is probably the most important because she's the only one other than the defendant who could corroborate the fact that the victim in this case was physically abusive towards her mother. And this is, another reason this is important is because the prosecution belabored at trial the quality of the victim's relationship with his granddaughter, with Taylor. By all reports, by all accounts, they had a very good relationship. And she would have been able to corroborate the fact that her grandfather had physically abused her mom in her presence. Now, given that she was 7 years old at the time that this took place, I believe the court and a jury would indulge her if she were not able to give precise times, dates, things of that nature. She can testify to where it happened and the circumstances of what she saw. But I do believe that while that may ultimately go to the weight of her testimony, it would not go to the admissibility of it. Thank you. May it please the court, counsel. Good morning. Your Honor, I wanted to briefly touch on, I believe what Justice Spence was asking opposing counsel right at the end, which is the fact that many of these affidavits from the lay witnesses do not have any sort of dates or times associated with them. And I believe opposing counsel stated that it's difficult to be very detailed in those affidavits. However, it is the defendant's burden at a post-conviction to put forward sufficient evidence and facts in those affidavits to sustain and meet his burden. The difference between a second and a third stage is this actually is the exact same standard, which is has the defendant made a substantial showing of constitutional violation. Now, the case law suggests that, excuse me, not suggests, the case law says that between the second and third stage, the difference that the court can make is that at the third stage, the court can make credibility determinations and findings of fact. The fact that the defendant says, I just need to put forward a reasonable amount of facts, I think does not excuse, as Justice Spence pointed out, does not excuse the fact that the affidavits of the lay witnesses are very vague and very, there is no knowing of what time and whatever, you know, when these things occurred. And for those reasons, that's why counsel didn't have, you know, didn't have any deficient performance. Counsel... Isn't Taylor's affidavit a little more specific, though, based upon, as counsel points out, her age? I mean, she's seven when this occurred, so she, you know, is only going to have memory back to whatever, say, three, four, five, whatever. So, I mean, you have, and that fits within the time window of what the defendant testified to the abuse, when the abuse began, correct? Well, actually, here in the post-conviction, defendant has put forward two different versions as to when the abuse began. At trial, the defendant argued, or excuse me, the defendant testified that the abuse began about eight to ten months prior to the shooting, and that it happened about five to six times. In her speaking with the mental health expert, she's claiming that the abuse began five to six months after the mother died in 1999, a significant difference in terms of timing of how long this abuse occurred. Counsel points out that that may very well be a typo in the report, that, because that would, five to six years would fit into what the defendant testified to at trial. No, excuse me, at trial, the defendant testified five, eight to ten months prior to the shooting. Right. So in late, excuse me, summer, late fall 2005. Right. The mental health expert in her report states five to six months after the mother died in 1999. What I'm saying, though, is that's five to six years after 1999 is the time of the, is around the time of the shooting, correct? Correct. I'm sorry, Your Honor, I'm not sure. If that was a typo, if instead of saying five to six months, it said five to six years, would that fit into the defendant's testimony at trial? I'm sorry. Five to six years that, in terms of the abuse, began five to six years after the mother, and that the health, the mental health experts, which the defendant had, I'm sorry, I'm just not following. What did the expert's report say? The expert's report said, give me one second, Your Honor, and I apologize, I'm sorry, I'm just not following the difference. That's okay. I'm not either, so that's okay. If you look at the defendant's, I don't, I apologize, I don't have the record citation to the appellate court record, but if you look at the verified petition that the defendant filed, on page three of the expert's affidavit, she writes, the victim began physically abusing Christy five months after his wife died. His wife died in 1999. At trial, the defendant testified that the physical abuse began fall, late summer to fall 2005, and that there were five to six events of physical abuse that occurred between summer to late fall 2005 and the time of the shooting on May 19th, 2006. All I'm saying is if you change the word months in the expert's report to years, does that fit into the defendant's testimony at trial? The defendant at trial said five to six months prior. Five to six times it occurred. Right. So I would assume that the defense can argue that the victim or that the defendant perhaps didn't appreciate what abuse was until she talked to the expert. What physical abuse was? Or battered woman syndrome. Well, respectfully. As opposed to, I guess, Justice Berguson, while it may have been a mistake with respect to months versus years, but I'm just guessing that the defense can certainly make an argument. Well, her testimony was different at trial because she didn't see an expert. And had she seen an expert, she would have known that this abuse started long before she felt that it had occurred. In terms of, well, two responses to that, Your Honor. First, in terms of typos, again, it's the defendant's burden at the second stage to put forward it. And that's a significant typo. Five to six, you know, five months after the wife died in 1999 compared to five years. I mean, that's a significant typo. And that unfortunately has an impact as to whether or not the petition has a sufficient basis of facts to set forward a substantial showing of constitutional violation. And Justice Shostak, in regards to your question about maybe she didn't know about abuse, if we're taking the affidavit as true, which is as opposing counsel says that we must, she told the mental health expert that he began to physically abuse her five months after the wife died. Physical abuse, in terms of not understanding what it might be, I find that to be a little incredible. In terms of if they're hitting, you know, I just find that to be a little incredible. And in fact, trial counsel went with a strategy that was consistent with the facts of the case and the facts that were presented at trial. He used the fact that she testified at trial that it only occurred five to six times to bolster her credibility in his closing argument. I'm going to point to page 3091 in the closing argument, and I'm going to read to you what the defense counsel stated as to why this would be significant towards her credibility. You heard Christy describe the relationship. If she were going to tell you, make up some stories about how abusive he was, she could have come here and told you, he hit me a thousand times. He sexually abused me. Did she tell you that? No. She told you about the time it happened. And you know what? It happened around the time when he was pissed and blew up about the taxes. She didn't stretch it. She didn't embellish. And that is, again, an indicator of some trial strategy in terms of using the facts that he had to make a significant self-defense claim. The strategy was based upon the evidence at trial, and what the trial counsel did, which was not unreasonable, was look at the characteristics and reputation of the victim. And he brought in multiple witnesses and cross-examined multiple witnesses that the prosecution brought forward that the victim had a mean demeanor, an abusive demeanor, a violent demeanor. And so, therefore, given that nature, when the victim pulled a – according to the defendant, when the victim pulled a gun on her, she reacted as any other person in a normal reputation would do. And, you know, the defendant keeps saying that it was an unarmed victim and it was a non-confrontational situation. That's not what the defendant herself testified at trial. At trial, the defendant testified that she came into the room and the victim was there pointing a gun at her. Battle-winning syndrome is not relevant to whether or not a person would reasonably believe that he feared imminent harm at that point. If someone came in and pointed a gun at you, any reasonable person's belief would be that there was an imminent harm. Battle-winning syndrome doesn't make that any less – any more, you know, any less – But doesn't that – wouldn't it explain, once you wrestled the gun away from him, which, again, her testimony was at trial, wouldn't that explain them putting two bullets in the back of his head as opposed to just saying, get out of here and pointing the gun at him or calling the police? I would argue that the – that counsel did show that by showing the victim's violent reputation and abusive, you know, and abusive nature. The defendant testified that it happened so quickly. And, again, according to the defendant's testimony, it happened so quickly. She came in, he had the gun pointed out at her, they had a struggle, and then he – she shot him as he was turned around and coming back up. Self-defense in terms of a reasonable belief of someone who is of a substantially larger size than you coming at you with a gun, I don't think that there would be a – I mean, if counsel had testified, certainly that testimony would have been relevant to bolster the defendant's defense as to why she shot him in the back of the head, and then, as counsel points out, what she did afterward in not calling the police and trying to burn the body and all those things. Dr. Consol's report is based on some inconsistencies at trial between what the defendant has said and what has occurred at trial. One of those that we discussed was the – a time of the abuse. There were some other things listed, which were, you know, getting guns and – Dr. Consol's report admits that she didn't review all of the evidence presented at trial and that she didn't review everything that was put forward before the jury. There are some significant inconsistencies. Dr. Consol also, you know, talks about what – to explain her behavior after the – after the death of the victim, and defendant cites to people the menace. However, defendant's actions went beyond just covering up the body and trying to dispose of the body. It was an active strategy to mislead the police. It was sending – taking a car and putting it up in Kenosha. It was going up in Door County and putting the business cards everywhere. It was, you know, there was a – Going to his apartment. Exactly. I mean, there's – it's more than just trying to make the body go away. It's actively thwarting the investigation. Her sister testified that she didn't even want to go to the police. And so am I – and Justice Berk, in answer to your question, I don't think her – Dr. Consol's report in the manner of the – consistent with the facts presented at trial. I don't – her inconsistencies would, again, have impact on credibility and potential trial strategy. Let me ask you something about those inconsistencies, though. At this stage of the proceedings, how are we to look at those – I see what you're saying about there are inconsistencies in what Dr. Consol says, the defendant told her, as to what the defendant testified at trial. How are we to look at those inconsistencies at this stage of the proceeding? At this stage, at second stage, there is a taking the facts as true presented. But taking those facts true as presented, you also – this court looks at what the record was before and how the – and what the facts were that were presented at trial. There were some significant inconsistencies. And as Your Honor pointed out, there is a – raising bad women syndrome in a father-child context is unusual. In fact, there's no – I have been unable to find a case where there's a father-child relationship in which the father and child don't live together. They don't reside together. That's something we have to take as true at this point in time. I mean, because that's not rebutted by the record. No. I mean, what's rebutted by the record is that it was a father and a child. But other than that, I mean, Consol's report says that bad women syndrome applies to this situation as a form of post-traumatic stress disorder. That's correct, Your Honor. However, we can look at it in terms of Consol's trial strategy and whether it was reasonable. Taking the defendant's affidavit, she says that it was discussed as a possibility. Taking the fact that bad women syndrome is not – has not been seen in cases of father-child syndrome, it's not unreasonable for Consol to decide not to put that forward. So you're saying that his decisions do not meet the Strickland standard based upon – I would agree that that would be a factor to discuss. Go ahead, Your Honor. And I also – again, Consol put forward a strategy that was consistent with the facts presented. And the facts presented were there was a confrontation, and as Your Honor has discussed, bad women syndrome a lot of times is used to show in non-confrontational settings why there would be some forceful action or some shooting of the paramour or of the relationship when there wasn't a struggle or a confrontation. Here, the defendant testified that the way it happened was that he came at her with a gun. Bad women syndrome isn't something that would be mean to show that someone would not be acting reasonable in that sense. So using those facts and using what the defendant herself testified to, Consol's strategy of showing how the victim was viewed in his reputation is sufficient. And we're looking at the reasonableness of Consol's strategy. And just because on appeal or in hindsight they might have taken a different tactic to show self-defense, well, that's not deficient performance. That's just a difference in strategy. And within strategy, it is the Consol's decision on which witnesses to call and whatnot. In the people's brief, we did speak about the prejudice prong, and I believe Your Honor has touched upon it. If there are no further questions, I see my time is up. Thank you so much. Thank you. Consol, you can step down. Thank you. She makes a good point. You know, battered woman syndrome, a guy is in bed and a woman burns the bed because she's had enough. Isn't what we're doing here self-defense or defense of herself, and isn't that what was presented at trial? The purpose of raising battered woman syndrome is to support a claim of self-defense. And one thing I want to address is sort of the last thing Consol was speaking to as well. The defendant, her version of events was there was a confrontation. That may be true, but it was incumbent upon trial Consol to recognize the state's evidence and have a plan to address it. Knowing that the victim had been shot twice in the back of the head and the defendant didn't report the shooting, it was incumbent upon him to investigate this kind of evidence to see if there could be an explanation, if the jury were to accept the prosecution's theory as to how the shooting occurred. If battered woman syndrome has never been applied to a father-daughter relationship, how could it be ineffective to not raise it then? Well, I think what Consol is speaking to is perhaps if you do a Westlaw search, a case might not pop up on Westlaw showing that it's never been applied to this situation, but how can you know without actually speaking to it? Well, you didn't find any, right? No, I didn't, but I spoke to an expert who said that it does apply in this situation. So if Consol never spoke with – again, if Consol spoke with an expert and the expert said, well, you can't really use this because this is a father-daughter relationship as opposed to husband and wife or boyfriend-girlfriend, and then he decides not to use an expert, trial strategy. But he never contacted an expert. My suspicion is that if you – if he had contacted an expert, other than Dr. Consol, many of them would say, yes, the abuse that she is reporting would lead a lot to a lot of the same behavioral, psychological ways of thinking or patterns of behavior that are consistent with battered woman syndrome, even though you might not label it battered woman syndrome. You might label it just abuse with post-traumatic stress disorder or something along those lines. But again, Consol cannot have made a strategic decision without actually picking up the phone and calling and consulting with an expert. A lot of what I'm hearing the State set forth are things that are pertinent at a third-stage hearing. They want to challenge the – was there an adequate foundation for these witnesses to testify? A lot of those things go to the weight of testimony as opposed to its indisability. Well, Consol is correct, though, that if some of the affidavit information is rebutted by the record, then we can look at that. And her comments are that Consol's report, in some very serious ways, is rebutted by the record. I completely disagree with that. And I think that your Honor's questions were right on point. If you look at her report as a whole, the reports, the things that she – both regard to the circumstances of the abuse and the time frame all match up with what was testified to at trial. This comes down to one word in the report, months instead of years. The victim's wife passed away in 1999. So – and the abuse with – as the defendant testified to at trial began in approximately 2005. So if that had said years instead of months, it would have been correct. And by the way, the report does not necessarily attribute that statement. It doesn't say, Christy told me that the abuse began five months after her mother died. It just states – states it as a fact the abuse began five months after her mother passed away. Of course, Dr. Consol reviewed a lot of materials, including the trial transcripts, which leads me to believe that, again, it's a typographical error. She obviously would have had the testimony from Ms. Lentz in front of her where Ms. Lentz specified in detail when the abuse started to take place. I don't know how Counsel's argument regarding his client's credibility is inconsistent with calling an expert in battered woman syndrome. Simply because he had a strategy doesn't mean that failing to call a mental health expert and consult with a mental health expert was a reasonable trial strategy. The two are not mutually exclusive. And again, I think that – Counsel did argue that he actually used the – he minimized the abuse to show her credibility. Right. He actually minimized her testimony of the abuse. If I may respond to that, I think what the State is essentially arguing is, well, battered woman syndrome doesn't apply because she didn't testify to being abused thousands of times. That's – my understanding is that that's not the criteria of what battered woman syndrome would be. In other words, her testimony supports – and again, reading – viewing Dr. Counsel's report, her testimony, the things that she testified to, supports the conclusion that she was suffering from battered woman syndrome. The two are not mutually exclusive. Thank you very much. Both of you, thank you so much for your arguments today. We will take this case under consideration and render a decision in due course. Thank you for your time. Thank you.